JONES, JUDGE:
Appellant, Michael J. Scanlon, appeals an order of the Fayette Circuit Court which found that a canopy bar located in real property assigned to Appellee, Margaret T. Scanlon, was a fixture and, therefore, belonged to her. Following review of the record and applicable law, we reverse and remand to Fayette Circuit Court.
I. BACKGROUND
Michael ("Mike") and Margaret ("Missy") were divorced on May 5, 2014. Prior to the decree of dissolution being entered, Mike and Missy had negotiated and executed a separation agreement, which divided the parties' many assets. A mediated agreement, which was incorporated into the separation agreement, indicated that Missy would retain the real property located at 535, 540 and 561 E. Second Street in Lexington, Kentucky (the "Fleetwood Garage"), which had a stated fair market value of $1.585 million. The agreement further provided that "[u]nless otherwise noted herein, everything located in the Fleetwood [G]arage" would go to Mike. Items specifically excluded were certain vehicles and furniture from the parties' marital residence that were being stored in the Fleetwood Garage. Per the terms of the separation agreement, Mike leased the Fleetwood Garage from Missy through November 2014. Among the items Mike *313 took with him when vacating the Fleetwood Garage was a free-standing canopy bar (the "Bar").
In February of 2015, Missy moved the trial court for an order requiring Mike to return the Bar to her.[1] In her motion, Missy noted that one of the appraisal reports on the Fleetwood Garage described the Bar as a built-in wet bar in its description of improvements to the real estate. Accordingly, Missy argued that the Bar was a fixture to the Fleetwood Garage and should not have been removed by Mike. In Mike's response, he pointed out that a different appraisal report, which had been done at Missy's request to value the personal property located in the Fleetwood Garage, included the Bar. Mike further noted that, contrary to Missy's assertions, the Bar was free-standing and had not been bolted to the floor or walls. Based on his belief that the Bar was personalty and the fact that Missy had not been specifically awarded the Bar in the separation agreement, Mike contended that the Bar was his rightful property.
The parties attempted to resolve the matter between themselves, but were unable to do so. At the trial court's request, Mike submitted a memorandum on the issue of whether the Bar was a fixture, personalty, or a trade fixture on October 28, 2015. In that memorandum, Mike maintained his argument that the Bar was personalty. To support this, Mike again noted that the Bar was freestanding and that its only connection to the structure of the Fleetwood Garage was a cold-water line used to provide water to a sink built in to the Bar. In the alternative, Mike argued that if the trial court found the Bar to be a fixture, it must be considered a trade fixture because he had used the Bar to promote his auto business and other business ventures.
The trial court conducted hearings on the matter on October 29, 2015, and January 28, 2016. Mr. Ambrose Wilson, who had been hired by Mike to help him move the Bar to its new location, testified that the Bar was comprised of multiple pieces so that it could be disassembled and relocated when desired. He further indicated that the Bar was free-standing and finished on all four sides. Ambrose stated that removing the Bar had left no damage to the walls or floor of the Fleetwood Garage. He noted that while a water line had been connected to the sink in the Bar, the sink was not attached to the wall, but was built in to the Bar itself.
Missy testified that she and Mike had purchased the Bar shortly after the Fleetwood Garage was built. She stated that Mike had purchased the Bar to enhance the Fleetwood Garage so that the Garage could be used for social functions, and had even customized the Bar to include a glass etching reading "Fleetwood Garage." When questioned about the purpose of the Fleetwood Garage, Missy stated that they had used it to store automobiles and collectibles and to host wedding receptions, political fundraisers, and charitable events. Missy initially testified that a sink had been built in to the wall to accommodate the Bar; however, she later stated that she was unsure if the sink was part of the Bar or if it had been built in to the Garage. Missy acknowledged that the appraiser of personal property, Mr. Graham, had included the Bar in his appraisal report and had not included other fixtures to the Fleetwood Garage, such as toilets and ceiling fans, but she noted that the appraisal of the Fleetwood Garage had categorized *314 the Bar as an improvement to the real property. She testified that when she entered into the separation agreement, she was under the assumption that the Bar would be included as part of Fleetwood Garage.
Mr. Ben Campbell, who had done appraisals of the Fleetwood Garage in September of 2012 and April of 2014, testified next. He stated that for both the 2012 appraisal and the 2014 appraisal he had utilized a cost approach and a sales comparison approach. Ben indicated that in 2012, he had relied more on the cost-approach because he did not feel like comparable sales were as good as they could have been. Under the cost approach, the total value of the Fleetwood Garage came to $1.76 million. The Bar was included as a line-item in that total and valued at $60,000.[2] Ben stated that when he appraised the Fleetwood Garage in 2014, he relied more on the sales comparison approach and valued the Fleetwood Garage at $1.585 million. Under the sales comparison approach, Ben did not make an adjustment for the Bar. In comparison, Ben's cost-approach valuation of the Fleetwood Garage in 2014 did make an adjustment for the Bar, and valued the Fleetwood Garage at $1.695 million. Ben stated that, in conducting the cost-approach valuation, fixtures such as fans were included in the total. Ben acknowledged that he referred to the Bar as being built along a side wall in both the 2012 and 2014 appraisal reports. However, he testified that he believed the Bar was attached to the Fleetwood Garage only through plumbing, and when he viewed a picture of the Bar, he acknowledged that the Bar was standing out from the wall, but had a plumbing line running to it.
Mike was the last to testify. He stated that when he entered into the separation agreement, he believed that he would be taking the Bar with him. Mike indicated that this belief was based on the fact that the Bar had never been discussed as not being included as personal property located in the Fleetwood Garage and because the Bar had been valued as personal property in the appraisal report done by Mr. Graham. Mike testified that the sink was already built into the Bar when he and Missy purchased it. When he moved the Bar into the Fleetwood Garage, Mike hooked it up to a cold-water nozzle after assembling it. Mike stated that the only way the Bar had been attached to Fleetwood Garage was through the water hookup and a cord plugged into an electrical outlet for lights. He reiterated the fact that the Bar had never been anchored to a wall or floor, or trimmed up to a wall.
Additionally, Mike testified to the ways he had used the Bar as part of his businesses. Mike stated that Thomas and King, Inc., a corporation of which Mike is the President and CEO, had a rental agreement for use of the Fleetwood Garage. Mike indicated that Thomas and King used Fleetwood Garage for numerous company events and holiday parties, would conduct training at the Fleetwood Garage, and has held its annual convention at the Fleetwood Garage. Mike stated that Fleetwood Garage had been used to host numerous non-profit fundraisers-sometimes under the Scanlon name and sometimes in the name of Thomas and King-and political fundraisers. Mike testified that he did not stock liquor in the Bar absent an event, but that the Bar was a component of functions for Thomas and King.
The trial court entered an order finding that the Bar was a fixture on June 8, 2016.
*315 In so concluding, the trial court stated as follows:
This Court finds the bar was a fixture. The Campbell appraisals, at the description of the property. It specifically says bar included. The Court sees the bar akin to a situation where there is a pedestal sink, it is only plumbed in. The court does not believe anyone would think of removing the sink. It would not do any damage to remove the sink, you would be left with plumbing, so the bar is a fixture. Mr. Campbell considered it a fixture, it was plumbed in and therefore it should stay with the building. As to [Mike's] claims the bar to be a trade fixture, even if they used the bar for receptions and other functions; however; the primary purpose of the warehouse building was to house and repair [Mike's] antique car collection. This Court finds that the bar was not a trade fixture....
This appeal followed.
II. STANDARD OF REVIEW
In reviewing decisions of a trial court without a jury, we review the court's findings of fact for clear error. CR 3 52.01. "If the trial judge's findings of fact in the underlying action are not clearly erroneous, i.e. , are supported by substantial evidence, then the appellate court's role is confined to determining whether those facts support the trial judge's legal conclusion." Commonwealth v. Deloney , 20 S.W.3d 471, 473-74 (Ky. 2000). We review the trial court's legal conclusions de novo. Nash v. Campbell Cty. Fiscal Court , 345 S.W.3d 811, 816 (Ky. 2011).
III. ANALYSIS
On appeal, Mike contends that the trial court erroneously interpreted the separation agreement as allowing Missy to retain the Bar, erroneously found that the Bar was a fixture to the Fleetwood Garage, and-in the alternative-erred in finding that the Bar was not a trade fixture. As noted previously, the separation agreement does not mention the Bar when dividing the parties' assets. Rather, it provides that Missy is to retain the Fleetwood Garage, while Mike shall retain everything located in the Fleetwood Garage-absent certain named exceptions. Therefore, the central issue in this appeal is whether the trial court erred in determining that the Bar was a fixture.
Our courts apply three tests to determine whether an article is a permanent fixture. Doll v. Guthrie , 233 Ky. 77, 24 S.W.2d 947 (1929). "First, annexation to realty, either actual or constructive; second, adaptation or application to the use or purpose that the part of the realty to which it is connected is appropriated; and, third, the intention of the parties to make the article a permanent accession to freehold...." Tarter v. Turpin , 291 S.W.2d 547, 548 (Ky. 1956) (citing Doll , 24 S.W.2d at 948 ). "[T]he controlling factor is the intention of the parties." Id. (citing American Rolling Mill Co. v. Carol Mining Co. , 282 Ky. 64, 137 S.W.2d 725 (1940) ).
Actual annexation occurs when an item is physically attached to the real property, such that it could not be removed without considerable force or damage to the item or the real property. See State Auto. Mut. Ins. Co. v. Trautwein , 414 S.W.2d 587, 589 (Ky. 1967). Constructive annexation occurs "when a particular article, although not permanently attached to realty, is so adapted to the use to which the realty is put that it may be considered an integral part of the realty...." 36A C.J.S. Fixtures § 13 (2017). Constructive annexation *316 can also be found when the "removal leaves the personal property unfit for use so that it would not of itself and standing alone be well adapted for general use elsewhere." Id. ; see also Doll , 24 S.W.2d at 949.
The second test, the "adaptation" of the item, is met when an item is adapted or applied to the use or purpose of the property to which it is connected. Id. "[T]he adaptation of the object to the use of the property is met when the object and the real property are united in the carrying out of a common enterprise." 36A C.J.S. Fixtures § 14 (2017). The adaptation test "is generally considered as entitled to much weight, especially in connection with the criterion of intention...." Doll , 24 S.W.2d at 948.
The third test, intention of the parties, "is held to be the chief test." Id. "[T]he intention to make an article a permanent accession to the realty must affirmatively and plainly appear, and if the matter is left in doubt and uncertainty the legal qualities of the article are not changed, and it must be deemed a chattel." Id. Intention is "inferred from the nature of the article affixed, the relation and situation of the party making the annexation ... the structure and mode of the annexation, and the purpose or use for which the annexation has been made." Clore v. Lambert , 78 Ky. 224, 227 (1879). The first two tests-annexation and adaptation-are used in determining a party's intention. Doll , 24 S.W.2d at 948. "If [the item has] a special adaptation to the use to which the freehold is being applied, and its removal would seriously impair its value, then such an intention may fairly be inferred as to constructively connect it with the freehold, and the business for which it is being used." Id. (quoting Hill v. Munday , 89 Ky. 36, 11 S.W. 956 (1889) ).
Trade fixtures are distinguished from "ordinary" fixtures. While an ordinary fixture is considered a part of the real property to which it is attached, trade fixtures are considered personal property and may be removed when vacating real property. Bank of Shelbyville v. Hartford , 268 Ky. 135, 104 S.W.2d 217, 219 (1937). " 'Trade fixtures,' is a term usually employed to describe property which a tenant has placed on rented real estate to advance the business for which it is leased...." Id. at 218-19. Thus, the central question in determining whether an item is a trade fixture is whether the lessee installed the item with the intent that it be used "to aid him in carrying on his trade or business on the premises." Id. at 219.
In the instant case, the trial court found that "the primary purpose of the [Fleetwood Garage] was to house and repair [Mike's] antique car collection." This finding is supported by substantial evidence. While both Mike and Missy testified that they had used the Fleetwood Garage on many occasions for social and charitable events, neither contended that the main purpose of the Fleetwood Garage was for entertaining. Missy testified that she and Mike had built the Fleetwood Garage to store vehicles, car parts, and various items that Mike collected. Further, the separation agreement, executed by both parties, states that the Fleetwood Garage is an "automobile warehouse."
As we agree with the trial court's finding that the primary purpose of the Fleetwood Garage was for storing and repairing vehicles, we agree with its conclusion that the Bar is not a trade fixture. While Mike may have utilized the Bar during events and training connected with his job at Thomas and King, there was no testimony indicating that the Bar was purchased to advance Mike's business in any way. As the Bar cannot be considered a trade fixture, *317 it must be classified as either personalty or an "ordinary fixture" under the three-part test.
The first part of the test looks to whether the item in question has been annexed to the real property-either actual or constructive. There was no dispute that the Bar was freestanding and not physically attached to the Fleetwood Garage in any way other than by a cord plugged into an outlet and a cold-water hose hooked up to the Bar's sink. Both of these means provide for easy removal, causing no damage.[4] In light of the trial court's finding that the principal purpose of the Fleetwood Garage was to house and repair automobiles, we cannot find that removal of the Bar leaves the Fleetwood Garage incomplete. Further, the Bar is not unfit for use outside of the Fleetwood Garage. Therefore, the Bar does not meet the first test.
Likewise, the Bar does not meet the second test-adaptation. We again note the trial court's finding that the primary purpose of the Fleetwood Garage was to house and repair vehicles. The Bar's presence in the Garage did not enhance its purpose, nor does its removal diminish its purpose. Missy testified that she and Mike purchased the Bar specifically for the Fleetwood Garage because Mike wanted to "enhance" the garage so it could be used for social functions. Just because an item was purchased to go in a building, however, does not mean that item is adapted to the building. The Bar was not custom made for the Fleetwood Garage. There was no evidence or testimony suggesting that Mike or Missy designed a certain area of the Fleetwood Garage to house a bar when constructing the Garage. The trial court likened the Bar to a pedestal sink in determining that the Bar was a fixture, reasoning that both items need to be connected to a water line to be functional. When looking to the adaptation test, however, the distinction between the hypothetical sink and the Bar becomes clear. Sinks, whether they be found in a kitchen or in a washroom, typically are adapted to the real property in which they are housed; they lend to the purpose of those rooms. In contrast, the Bar does not lend itself to the purpose of the Fleetwood Garage.
Finally, we cannot find that the parties intended the Bar to be a permanent accession to the Fleetwood Garage. "[T]he other tests are really part of this comprehensive test of intention, and ... they derive their chief value as conspicuous evidence of such intention." Doll , 24 S.W.2d at 948. As noted, the Bar was not bolted to the ground or walls, or physically attached to the Fleetwood Garage by any means. The nature of the Bar is not such that one would ordinarily expect to find it in a structure such as the Fleetwood Garage. We note that the parties purchased the Bar to be used in the Fleetwood Garage and customized a mirror attached to the Bar to reflect the name of the garage. This, however, is *318 not sufficient to show that the parties intended that the Bar remain as a permanent attachment to the Fleetwood Garage. Accordingly, we cannot agree with the trial court that the Bar was a fixture.
IV. CONCLUSION
Based on the foregoing, we reverse the portion of the trial court's order finding that the Bar was a fixture to the Fleetwood Garage and awarding it to Missy and remand for the trial court to enter an order consistent with this opinion.
ALL CONCUR.

Various other issues relating to the separation agreement were also addressed in the motion and throughout the subsequent proceedings; however, as this appeal only concerns the Bar, we limit our discussion to facts relevant to it.

Ben testified that he did not personally appraise the Bar and value it at $60,000, but had received a memo from Mike's office stating that the Bar was worth $60,000.

In her brief to this Court, Missy contends that "[d]amage to the building did in fact occur with the removal of the bar, as evidenced by Missy's expert Joe Wingfield's estimate to repair the building after Mike vacated the property." R. at 10. Mr. Wingfield did testify to damage to the Fleetwood Garage, which he repaired at Missy's request after Mike vacated the building. Mr. Wingfield's estimated cost for the repairs and photographs of damage to the Fleetwood Garage were submitted into evidence. While Mr. Wingfield testified to various damage to the Fleetwood Garage-signs that needed to be removed, holes in the drywall from mounting things to the walls, exhaust marks on the floor and on the walls, and debris on the floors-he did not indicate that this damage had been caused by removal of the Bar. This testimony was presented in support of Missy's motion that the court order Mike to be responsible for all repair and cleaning costs caused to the Fleetwood Garage during Mike's tenancy.